Thank you, please be seated. Your Honor, second case of the morning, call 208-1158, people of the state of Illinois v. Moses Tugume. On behalf of the attorney, Ms. Joette Spelman. On behalf of the attorney, Ms. Joan M. Crick. Good morning, counsel. I would extend apologies from Justice O'Malley, who's not able to be here. He's recently had knee surgery, is recovering well, but isn't able to be here today. So we certainly miss him, and again, we extend apologies from him. Thank you. All right, Ms. Gelnick. Good morning, Your Honors. Counsel, may it please the Court. My name is Joette Gelnick, and I'm here this morning on behalf of Moses Tugume. Mr. Tugume pled guilty to one count of predatory criminal sexual assault in exchange for an agreed sentence of 11 years' imprisonment. He is asking this Court on appeal to allow him to withdraw his plea and to remand this case for a trial on the merits. There are, in this case, there are undercurrents of both ineffective assistance and prosecutorial misconduct in the form of discovery violations. But this case really boils down to an issue of fundamental fairness in that evidence was withheld from Mr. Tugume, DNA evidence, which What's the standard required in the field for this fundamental fairness? The standard under people named Morreale is the abuse of discretion. However, Morreale teaches us long ago, since some 50 years now, that although the trial judge is within the discretion of the trial judge as to whether or not to allow a withdrawal of the plea, it's a discretion that should always be exercised in favor of innocence and with a preference toward a trial on the merits. And certainly, I would go directly, in fact, to Morreale and suggest that all of the categories under which Morreale said the judge should allow withdrawal of the plea are pretty much here. First of all, that the plea was entered on a misapprehension of the facts or law or in consequences of misrepresentations by counsel or the state's attorney or someone else in authority. This plea was entered in a misapprehension of the facts, that being that DNA evidence was completely immaterial and insignificant, which is what his trial attorney told him, told him that regardless of the outcome of the DNA tests, it would not make a difference to his case. But now, counsel, is there anything in the record to indicate that the defendant was forced to take the state's offer within a specific period of time? I believe what the evidence shows is that he was given, basically, his attorney refused to inquire into the DNA. He repeatedly inquired about the DNA test results, and she essentially said, those are not material, those are not relevant, I don't care what they say, they're not going to change the outcome of this case. She talked to him about the strength of the state's case, notwithstanding that DNA evidence. Isn't that correct? The 911 call and the videotaped statement, she discussed that in detail with him in the context of the DNA evidence not being available. Isn't that correct? In other words, regardless of the DNA evidence, she talked to him about her assessment of the rest of the case. And I believe that it's simply unreasonable to give a client any kind of recommendation or advice about a case where there's scientific evidence that's still outstanding that the client is inquiring about. And are you saying that she pressed him to take the offer at that particular moment, even though there was no deadline by the state? Is that what the record demonstrates? Well, the record actually demonstrates that this case was being pushed to a judgment, which is another unusual thing in this case. There were initially three Class X charges against Mr. Dugumi, three predatory criminal sexual assault charges. He was indicted on December 20th. As of February 20th, the case was set for trial. The judge was very unhappy that the parties weren't ready to go to trial by February 20th. I'm sorry, it was February 16th. Two days before the trial date on February 14th, the state brought in a motion asking to be allowed to bring in 11510 statements. Most of those, at least some of those statements, had not even been tendered to the defense. The judge indicated that he was not willing to continue the date, and they were going to continue to the trial date of February 16th. And maybe he would or wouldn't allow the state to introduce the 11510 statements, some of which the defense had not even seen. The state's attorney then asked for continuance on the state's motion saying that they were still awaiting the DNA test results, and the judge allowed it on that basis. Was there also discussion of a possible plea agreement in light of the 7-day continuance? Well, there's actually some very interesting facts in here. On the 20th, the judge did agree to continue the trial to March 30th. The parties appeared in court on March 21st, and defense counsel at that point, and that was a time when the first DNA test results were in fact available. Very significant test results showing that of all the samples taken from the complainant, vaginal, anal, oral swab, samples from her legs, not only was it only her DNA found on there, but they were able to exclude the defendant as the source of any DNA. So it wasn't just that inconsistent he couldn't be excluded or there wasn't enough to test. He was excluded. But on the 21st, when these results were available, defense counsel came into court, announced to the judge that they were trying to work things out and that the state was going to give the defense additional discovery. I don't know what discovery that refers to because there was additional discovery available, including this very significant DNA test result, and yet the defense never got it. Defense attorney never requested it. Defendant was never told about it. I think with respect to whether this was knowing or voluntary or the defendant had the option of not taking the plea, it's similar in some respects to the Illinois Supreme Court's recent decision in People v. Hall from 2005. And that was a case where it was a post-conviction case. The defendant had entered a guilty plea to an aggravated kidnapping based on the allegation that he had taken a car with, I believe, a 2-year-old child in the back. In his post-conviction petition, he said, I told my lawyer that I didn't know the child was in the back. My lawyer told me that's not a defense and that if I got convicted, I would get 25 years. And so based on that advice, I took the plea. The Illinois Supreme Court held that if those facts were, in fact, proven at an evidentiary hearing, that would show that he had a viable defense and he would be entitled to withdraw his plea. I think what happened here is very similar. This defense attorney said the state has a strong case, that you're going to get convicted because of the violent nature of these charges. You are going to be convicted on at least two of the three charges. The state will easily get a sentence in double digits. The results after trial will be incredibly severe. And essentially, the DNA test results, whatever they show, will not be a defense for you. They're not a defense. That's essentially what this attorney reported. The original attorney couldn't get that type of advice, not considering the fact that there was other information available not known to the attorney. Do you agree with that? I'm sorry. I'm not sure I understand. Number one, the attorney indicated that the evidence against the defendant was strong. Do you agree with that? No. Actually, I don't because the record- Excluding the DNA. No, I know. The record shows a number of very troubling inconsistencies in the state's evidence. First of all, we don't know what the 11510 statements are, but Mr. Tagumi did allege in his post-conviction petition that the complainant's statements in the videotapes were very inconsistent. Secondly, the report of the offense was inconsistent. It initially started out as a report that the defendant was found lying on top of the complainant, and then at the time of the motion to vacate the plea, it turned into the complainant and the defendant were found in a closet facing each other. Without any clothes on. Correct, but it's kind of mind-boggling that it would change to such different from the same person. I'm talking about when the attorney initially recommended to the defendant that he plead. At that time, there was no knowledge that the testimony of the aunt would be inconsistent relative to the facts of the crime, the facts that were stated on the record. No, but what I see in the record is that there were some inconsistencies according to what's in the record by the complainant herself. Now, what those are, unfortunately, we don't know because we don't have the 11510 tapes or transcripts. With respect to the attorney saying the state had a strong case, to my mind, that's equivalent to say you have a case where there's eyewitness testimony. And what this is really boiling down to, I think, is eyewitness testimony because there is no scientific objective evidence that is linking Mr. Tagumi to this offense. So if you have a case where it's based on eyewitness testimony and the defense attorney questions the state witnesses and they're very clear and they're very certain- The testimony was that the aunt, at that point in time, I'm not talking about at the time that there was a hearing and the DNA evidence was available. I'm talking about the initial conversation where the defense attorney recommended to the defendant that he take a plea. At that point in time, the facts apparently available to the state and the defense was that the defendant was found lying on top of a child in bed. Two, there was a call, a 911 call made, and although we don't know the details of that call, the general implication was that that was strong evidence against the defendant. They had the siblings that were available to testify relative to acts that could be- I believe that might have also come from the aunt, the information about the siblings. So whether that's accurate or not, I think, is also subject to question. I'm just talking about discussion by the attorney relative to recommending a plea to the defendant at that point in time. Yeah, I don't know that we know if this lawyer had information about- It appears to me that at least she would have information about the inconsistencies in the complainant's own statement, because I would assume at some point the state did turn over the complainant's statements, and there is an allegation in the record that those statements in and of themselves were inconsistent. But I think, Your Honor, to go beyond that, I don't believe it's reasonable assistance where a client is saying, I would like to see that evidence. For example, if you have a case with simply eyewitness testimony, and the defendant tells his attorney, I know of an eyewitness who was at the scene, saw the offense happen, and can say without any question that it wasn't me. Would it be reasonable for the attorney at that point to say, well, I've talked to the state witnesses, and boy, they really sound credible, and I believe them, and so I'm not going to investigate that other witness. Well, my next point is you have to really look at what the DNA evidence shows, what to support a post-conviction petition, a constitutional violation. Because if the DNA evidence shows that there was a statement found, you wouldn't have a post-conviction petition. Well, no, and this is not a post-conviction petition, Your Honor. So now we're looking at the facts that are available to us based on information provided by the state, obtained by the defense attorney after the complaint. Correct, but this is not, first of all, it's not a DNA, I'm sorry, it's not a post-conviction petition. This is a hearing on a motion to withdraw this plea. But I would call Your Honor's attention to two cases from this court, Hockenberry v. Hockenberry and people v. Starks, which recognize the significance of DNA evidence. And in those cases, I would say those are even less compelling than what we have here. But here, the reports, the DNA reports may not have supported, let's say, the allegations, but certainly they don't exonerate the defendant. Well, they certainly are exculpating. I think scientifically there is an allegation that he placed his penis in her mouth, ejaculated it in her mouth, placed his penis. But he pled to count one, counsel, correct? Correct. And there was no scientific evidence. And that was, as I recall, I might be wrong, that was mouth on. Mouth on vagina. Okay. Right, right. Which is strange. When there's saliva found on the complainant and it excludes the defendant, scientifically it's very difficult to imagine how that's possible if the complainant's story on what happened or the aunt's story as to what happened is credible. It's certainly something that should be given to a jury in a situation where the defendant, and everyone agrees, throughout the course of this trial court proceeding up to the time of the guilty plea, he repeatedly asked about the DNA test. In that situation where his lawyers basically tell him it doesn't matter. Well, we know that it does matter when you look at the Hockenberry case and the Starks case. DNA does matter. DNA has exculpated people in Illinois on a number of occasions. And what he's asking is an opportunity to present that evidence to a finder of fact when it was available, it wasn't tendered to him, his attorney basically told him it wasn't a defense when it is, and he wasn't really given an option to proceed because she essentially told him it doesn't make a difference. That was wrong advice. That was improper advice. There's not only the DNA evidence related to the complainant. It's also a little unclear to me. Essentially, I think the only thing the defense had was what was in People's Exhibit 1 that was tendered at the hearing on the motion to vacate. And I see I'm out of time. You will, but you'll have time on rebuttal, counsel. All right. Thank you very much. We would ask that Your Honors vacate his plea. Thank you. Thank you. Ms. Kripke? Good morning. Jim Kripke on behalf of the people of the state of Illinois. Counsel. The question that this court has to answer is the trial court abused its discretion in denying defendant's motion to withdraw his guilty plea. And the answer to that simply is no. And the next question that really should be answered is what did the defendant know or what didn't the defendant know and when did he know that? And the answer is he knew everything, including what he didn't know prior to pleading guilty. Now, I'm sort of taken aback by counsel's argument because this is their brief and their argument has morphed into an ineffective assistance of counsel claim, which was never alleged in their brief, was never raised as an issue. And I would be happy to file a supplemental brief answering a brief of theirs if they want to raise a question. But that is not the issue that was raised in their brief, nor was the allegation made that we had Brady violations raised in their brief. And it's unfair for the defense to come in at this late date and insinuate that we did these things or that the counsel did things ineffectively, but not raise them as a full-fledged issue and allow us to brief it and to attack those claims as they should be attacked. The other thing that was never alleged in the brief was that there was improper, any kind of improper admonishments by the trial court. They did make the allegation that the trial court pressured the defense into going to trial. And it's true at one point when the defense asked for a continuance, the court said no. But twice the state came in and rescued the defense, asking the court for continuance for the DNA results, and the court gave the state. We took the hit on the number of days, and we came in and we got the continuances, which benefited the defendant. So any kind of allegations such as those, first of all, either they weren't raised or if they, but to insinuate now that these things are happening is simply unfair. What kind of information did the defendant have? Well, first of all, they had the 911 call. Unfortunately, none of this is part of the evidence. And so that's what this court can only look at. What evidence is available to this court? What's part of the record? We are told, and by the way, the defense stipulated to these facts. So whether or not at one point the aunt came in and said the defendant was on top of the victim, and then later on it became the two of them were naked inside this closet. They stipulated to that evidence. What happened to the rest of the evidence could have been an additional part of it or could have been retracted. I don't know. But this is what this court can look at, and this is what the defendant stipulated to. So first of all, we have the hysterical 911 call in which apparently, I believe, the victim's voice was also heard. And other information that was out, there was audio and videotape of the child to the police saying what the defendant had done to her, which her allegations were what the defendant did to her. There was also information, I believe given by the aunt, that the younger siblings, when the aunt came into the apartment, the bedroom in which the defendant and the victim were found was barricaded in some manner. And the children, these other younger children, younger than the 9-year-old victim, I think the victim was 9, maybe she was 12, I think she was 9, told the aunt that the defendant was doing something private to her in that room. So all of this information was out there. Nowhere, nowhere in the record does it say that the defense attorney, that Moira McCure, refused to find the DNA. And that's the word the counsel just used in her argument. She said she refused to get that DNA evidence. That is simply not found in the record of this case. What she said to him was, look, we have People's Exhibit No. 1, which listed all the DNA tests that were being run. She said, even if this comes back and shows your DNA isn't anywhere, my feeling is that the other evidence presented by the state that the state has is so weighted against you, you're going to be convicted. And when they asked her, they said at one point the new defense counsel on the hearing said to her, well, Ms. McCure, isn't it true that the defendant said to you that he didn't do this? And Moira McCure replied, no, counsel, that's not exactly what he said to me. So, again, somewhere in the defendant's brief, the defendant says, well, that he continually denied having done this act. That also isn't true. Because the court found Moira McCure to be very credible when she testified. And if you read her testimony, you can almost hear the indignation in her voice when they said to her, well, didn't you push him to plead guilty? And she said, no. She said, never. She said, she does not do that. She lays out the facts for the defendant. The defendant, I think it's People v. Evans from the Supreme Court, which described a fully negotiated plea, as we have in this case, as a contractual agreement between the state and the defendant. If this court were to come in now and say, well, you know, now we see that the DNA evidence comes back and his DNA was not on her body in terms of what we're looking at for count one. Well, hindsight is great. But the state entered into a contract with the defendant. The defendant threw the dice. The state threw the dice. The defendant came up short on this one. I mean, I don't want to say that that's just tough luck. But this is, he made a reasoned decision to do this. He was looking at 20 to 30 years. And that was the advice of his counsel. Nowhere did anybody say that the counsel was not giving him bad advice. She was just laying out the facts that were there for him. If they want this to be argued as ineffective assistance of counsel, that's a whole different type of parameter. Those are different parameters which we have to look at. But that's not what we're looking at in terms of this case. The allegation in this case is that the defendant put his mouth on the victim's vagina. The definition of penetration is a touching, no matter how slight. It can be the penis. It can be the mouth. In this case, it was the mouth. When they talk about whether you can prove a penetration by the presence or absence of semen, when we're talking about penile penetration, the statute says you cannot, the presence or absence of semen is not proof that a sexual assault occurred or did not occur. And I would make that same analogy with saliva. The presence or absence of saliva is not proof that penetration did or did not occur. What we have is this child's allegation that it occurred in a videotape. The fact that the ex post facto knowledge that his DNA does not show up and that his amylase does not show up on her, that's fine. But it is not exonerating. It is not exculpatory. And we also don't have information. We don't have anybody testifying about how long someone's DNA remains on somebody else's body. We don't know if this child washed. We don't know if this child rubbed herself. We don't know anything about that. So whether or not that DNA is there is meaningless. It's not meaningless. It's out there, but it's not exculpatory. And when the defense looks at the Benny Starks case, Benny Starks had a lot of problems with that case. Foremost, out of the facts in Benny Starks, what is important about it is in that case, the defendant was also charged with aggravated battery of the victim, and they never, ever challenged that aggravated battery. It was known, it was proven beyond a reasonable doubt, that Benny Starks was at the scene and had battered that victim. We have the same situation here. And also in Benny Starks, they were emphasizing the presence of the semen at the trial, and that's why this court sent it back, because of the emphasis on the semen at that time. But in this case, what we have here is the DNA evidence does not exculpate the defendant because it doesn't have somebody else's DNA here like it did in the Benny Starks case. The semen in the Benny Starks case came back not to Benny Starks. What we have here is not a third party, and the defendant was found naked with this child. What time were the swabs taken? That's, I'm not, I don't remember exactly how many hours afterwards or how much time afterwards. There was just a warning that swabs were taken at the hospital at 1.30 a.m. There was also evidence from notes taken by an investigator that swabs were taken at 4.30 p.m. Right, right. What evidence did the swabs show? The swabs? Well, from the exhibits that came back, in terms of this allegation, the swabs show that the defendant's DNA was not on the child in the areas that they swabbed. It did show that his DNA came back. The vagina was one of the areas swabbed. Correct, correct. And she also talked, and on the legs and I can't remember where else. But in terms of the other two swabs, other two samples that were taken, his DNA came back in both of them. And I do stand corrected that in my brief I said his semen came back in one of the samples. That was incorrect. It came back as his DNA. I was making a leap of logic that was not correct in my brief. And also the defense objected to something else in my brief where they said, well, I wrote that they were found in the child's bedroom. Without looking at the record, I don't know if it was the child's bedroom or not. I do know that they were barricaded in a bedroom in that apartment, but I don't know if it was the child's bedroom particularly. Nevertheless, his DNA was found in the carpet of that room and also on some underwear that was found in that room. But his DNA was never found commingled with the child's DNA in any of the samples that was taken. But regardless, and in regard to Halawa and Morial, those cases were considered to be a manifest injustice for reasons that are not found in this case. In Morial, and the Supreme Court found that when they looked at the case in another case called Ramirez, in Morial, that's when the counsels were going between the two courtrooms. Nobody ever sat down at a table. No one was looking out for the defendant's rights. His own lawyer wasn't, and the state certainly wasn't looking to make sure there weren't any due process violations. So that was not what occurred in this case. And in Halawa, it was a teenage kid who went down and came down to the police. He said, we're not going to charge you. It's not going to be a problem. And then his father ends up getting a real estate attorney who did nothing. I mean, he didn't even make a motion to suppress. He did nothing for the kid. And so those are, you look at that and you say, sure, that was a manifest injustice. Somebody dropped the ball, or two parties dropped the ball, but nobody dropped the ball here. And there's one other objection I would like to see. I didn't catch the name of the case the counsel just argued about. I thought it was Galt or something. It was a 2005 Supreme Court case. It doesn't appear, unless I'm mistaken, it doesn't appear in any of her briefs. She said HALT. HALT? HALT. HALT? Was it in your case? H-A-L-L. Was it in your file? Okay. Fine. But other than that, I don't think I have anything else. Are there any other questions? Okay, thank you. Thank you. All right, Ms. Gilnick. First of all, Your Honors, this is not being presented as an ineffective assistance of counsel claim. That is a factor that goes to whether this was a knowing involuntary plea, which was what it was litigated as. HALT, in fact, is, again, a case where the claim by the defendant in the post-conviction petition was that his plea was not knowing involuntary because his lawyer told him he did not have a defense to an aggravated kidnapping charge when, in fact, that would have been a defense. So it's similar here that this attorney essentially told this defendant, you do not have any defense regardless of what the DNA test results show. And that was inaccurate. He does have a defense based on the DNA. With respect to the swabs, there is a conflict in this record that it appears the state's attorney represented that the swabs, the oral swabs. Now, the complainant in this case alleged that Mr. Tagume ejaculated in her mouth. The state's attorney at the hearing said, well, it doesn't matter that there was no DNA evidence associated with the defendant from the oral swab because they didn't take that swab until many hours later at the hospital. But there is some indication in this record that the swabs were taken at the police station of the child's mouth, which also, again, calls into question the entirety of this story. With respect to whether defense counsel refused to seek the DNA test results, that's how I would characterize it. At the time, she was advising him and telling him they were immaterial. These test results, at least with respect to the child, which excluded the defendant, every aspect of the child's DNA excluded the defendant. She never called to ask about the test. She never asked the prosecutor for the test. She never subpoenaed them. In my mind, that's a refusal to get the DNA evidence. Ramirez, which counsel cited, and I know, Your Honor, I've read the briefs, but Ramirez is nothing like this case. Ramirez is a case where the defendant pled guilty, was told expressly by the judge it was an agreed plea. You're getting five years in exchange for your plea. Do you understand that? Yes. Did anybody else make you any other promises? No. No promises. Nobody told you, well, we're telling you five, but it's really two or anything like that. No. He even had a hearing on a motion to vacate his plea where he never raised any claim that he was told something other than five years. His post-conviction petition, he said, well, gee, I was told by my lawyer I was going to get probation. Now, those facts, clearly, they're contradicted throughout the entire record. In this case, the defense attorney agreed that Mr. Tagume was very, very concerned about getting the DNA test results. She told him it wasn't important. Morreale teaches us that if the defendant has a defense worthy of consideration, which I would submit he does in this case, you should exercise discretion in favor of withdrawing the plea. I'd like to make one comment on my opposing counsel's comment that, well, when Ms. McCure was asked, did he ever tell you he didn't commit that offense, and she said, well, that's not exactly what he said. I don't know what she meant by that. It's never explained, but she does agree that he never said he committed this offense. So I don't think that there's any indication in here that he's acknowledging his guilt and somehow hoping that maybe he can get some evidence to exculpate him or that might exculpate him. He was consistently asking about that DNA and wanted the DNA, and now we know those test results, I mean, to say they're not exculpatory to me is mind-boggling when you look at the allegations that were made in this case as a whole. And in this case, because there's a question of his innocence, because he didn't get the test results he sought, and because it would be in the hands of justice to send this back for trial on the merits, which is what he's seeking, we would ask that Your Honors allow him to vacate his plea. Thank you. Thank you very much, counsel. At this time, the court will take the matter under advisement and render a decision in due course. The court stands in recess.